10 CIV 5437

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CHARLES SIMON, on behalf of himself
and all others similarly situated,

         Plaintiff,

   v.

KEYSPAN CORPORATION

and

MORGAN STANLEY CAPITAL GROUP INC.,

         Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION No.

**RECEIVED**

JUL 16 2010

U.S.D.C. S.D. N.Y.
CASHIERS

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Charles Simon ("Plaintiff"), on behalf of himself and all others similarly situated, through undersigned counsel, brings this civil action under Section 4 of the Clayton Antitrust Act (the "Clayton Act"), as amended, 15 U.S.C. § 15, to obtain relief from defendants' violations of Sections 1 and 2 of the Sherman Antitrust Act (the "Sherman Act"), as amended, 15 U.S.C. §§ 1 and 2, and Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and under the laws of the State of New York, alleging, on personal knowledge as to his own actions and upon information and belief as to those of others, as follows:

### I. INTRODUCTION

1. On January 18, 2006, KeySpan Corporation ("KeySpan") and Morgan Stanley Capital Group Inc. ("Morgan Stanley"), a financial services company, executed an agreement (the "KeySpan Swap") that ensured that KeySpan would withhold substantial output from the New York City electricity generating capacity market, a market that was created to ensure the

supply of sufficient generation capacity for New York City consumers of electricity. The likely effect of the KeySpan Swap was increased capacity prices for the retail electricity suppliers who purchased capacity, and, in turn, pass increased supply prices directly to consumers who pay for electricity.

2.      Between 2003 and 2006, KeySpan, the largest seller of electricity generating capacity ("installed capacity") in the New York City market (the "NYC Capacity Market"), earned substantial revenues due to tight supply conditions. Because purchasers of capacity required almost all of KeySpan's output to meet expected demand, KeySpan's ability to set price levels was limited only by a regulatory ceiling (called a "bid cap"). Indeed, the market price for capacity was consistently at or near KeySpan's bid cap, enabling KeySpan to sell virtually all of its capacity at the bid cap prices.

3.      But market conditions were about to change. Two large, new electricity generation plants were slated to come on line in 2006 (with no exit expected until at least 2009), breaking the capacity shortage that had kept prices at the capped levels.

4.      KeySpan could prevent the new capacity from lowering prices by withholding a substantial amount of its own capacity from the market. This "bid the cap" strategy would keep market prices high, but at a significant cost — the sacrificed sales would reduce KeySpan's revenues by as much as $90 million a year. Alternatively, KeySpan could compete with its rivals for sales by bidding more capacity at lower prices. This "competitive strategy" could earn KeySpan more than bidding its cap, but it carried a risk — KeySpan's competitors could undercut its price and take sales away, making the strategy less profitable than "bidding the cap."

5.      KeySpan searched for a way to avoid both the revenue decline from bidding its cap and the revenue risks of competitive bidding. It decided to enter an agreement that gave it a

financial interest in the capacity of Astoria Generating Company ("Astoria") — KeySpan's largest competitor. By providing KeySpan with revenues from a larger base of sales, such an agreement would make a "bid the cap" strategy more profitable than a successful competitive bid strategy. Rather than directly approach its competitor, KeySpan turned to Morgan Stanley to act as the counterparty to the agreement — the KeySpan Swap — recognizing that a financial services company would, and in fact did, enter into an offsetting agreement with Astoria (the "Astoria Hedge").

6.    With KeySpan deriving revenues from both its own and Astoria's capacity, the KeySpan Swap eliminated any incentive for KeySpan to bid competitively, enabling KeySpan to bid the cap on its capacity. Capacity prices remained as high as if no new capacity had entered into the New York City market.

## II.    PLAINTIFF

7.    Plaintiff, Charles Simon, is a citizen and resident of New York County, New York, and is and was at all times relevant to this lawsuit a customer of Consolidated Edison Company of New York, Inc. ("Con Ed"). Con Ed purchased electric energy and capacity in the NYC Capacity Market during the entire period from 2006 through 2009. Each month from at least May 2006 through February 2008, Con Ed passed through 100% of Con Ed's costs for the purchase of installed capacity in the NYC Capacity Market to its customers. Its customers, including Plaintiff, were contractually required to pay and did pay 100% of such costs as "supply charges" on their monthly billing statements. The quantity of installed capacity for which Plaintiff was required to pay Con Ed was contractually fixed prior to the time the price for such capacity was known and charged to Plaintiff.

3

### III.   DEFENDANTS

8.      KeySpan is a New York corporation with its principal place of business in New York City. During the time period relevant to this Complaint, KeySpan owned approximately 2,400 megawatts of electricity generating capacity at its Ravenswood electrical generation facility, which is located in New York City. KeySpan had revenues of approximately $850 million in 2006 and $700 million in 2007 from the sale of energy and capacity at its Ravenswood facility.

9.      Morgan Stanley is a Delaware Corporation with its principal place of business in New York, New York. Morgan Stanley is a financial services company. Morgan Stanley served as the counterparty in the KeySpan Swap and as a party to the Astoria Hedge.

### IV.   JURISDICTION AND VENUE

10.      Plaintiff files this complaint under Section 4 of the Clayton Act, 15 U.S.C. § 15, seeking relief from Defendants' violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18, and under the common and statutory laws of the State of New York.

11.      This Court has jurisdiction over the federal claims in this matter pursuant to 15 U.S.C. §§ 15 and 22 and 28 U.S.C. §§ 1331 and 1337, and has supplemental jurisdiction over the state law claims under 28 U.S.C § 1367.

12.      This Court has personal jurisdiction over Defendants and venue is proper under 28 U.S.C. § 1391(b)(2) and under Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15 and 22) because a substantial portion of Defendants' actions giving rise to the claims and injuries alleged herein took place in whole or part in this District, Defendants are residents of the State of New York, and Defendants are headquartered in regularly transact business in this District.

13.    Defendants engaged in interstate commerce during the period relevant to the allegations in this Complaint; KeySpan's electric generating units interconnected with generating units across the country, and KeySpan regularly sold electricity to customers outside New York. Morgan Stanley regularly engaged in financial services transactions and activities involving interstate commerce, including in the electricity industry sector, during the period from January 2006 through the present.

14.    During the relevant period, one generation facility located in New Jersey supplied capacity to the NYC Capacity Market.

## V.    THE NEW YORK CITY INSTALLED CAPACITY MARKET

15.    Sellers of retail electricity must purchase a product from generators known as "installed capacity." Installed capacity is a product created by the New York Independent System Operator ("NYISO") to ensure that sufficient generation capacity exists to meet expected electricity needs. Companies selling electricity to consumers in New York City are required to make installed capacity payments that relate to their expected peak demand plus a share of reserve capacity (to cover extra facilities needed in case a generating facility breaks down). These payments assure that retail electric companies do not sell more electricity than the system can deliver and also encourage electric generating companies to build new facilities as needed.

16.    The price for installed capacity has been set through market auctions run by the NYISO. The rules under which these auctions are conducted have changed from time to time. Unless otherwise noted, the description of the installed capacity market in the following paragraphs relates to the period May 2003 through March 2008.

17.    Because transmission constraints limit the amount of energy that can be imported into the New York City area from the power grid, the NYISO requires retail providers of

electricity to customers in New York City to purchase 80% of their capacity from generators in that region. The NYISO operates separate capacity auctions for the New York City region (also known as "In-City" and "Zone J"). The NYISO organizes the auctions to serve two distinct seasonal periods, summer (May through October) and winter (November through April). For each season, the NYISO conducts seasonal, monthly and spot auctions in which capacity can be acquired for all or some of the seasonal period.

18. In each of the types of auctions, capacity suppliers offer price and quantity bids. Supplier bids are "stacked" from lowest-priced to highest, and compared to the total amount of demand being satisfied in the auction. The offering price of the last bid in the "stack" needed to meet requisite demand establishes the market price for all capacity bid into that auction. Capacity that is bid at a price higher than this price is unsold, as is any excess capacity bid at what becomes the market price.

19. The NYC Capacity Market constitutes a relevant geographic and product market.

20. The NYC Capacity Market is highly concentrated, with three firms – KeySpan, NRG Energy, Inc. ("NRG") and Astoria Generating Company (a joint venture of Madison Dearborn Partners, LLC and US Power Generating Company, which purchased the Astoria generating assets from Reliant Energy, Inc. in February 2006) – controlling a substantial portion of generating capacity in the market. Because purchasers of capacity require at least some of each of these three suppliers' output to meet expected demand, the firms are subject to a bid and price cap for nearly all of their generating capacity in New York City and are not allowed to sell that capacity outside of the NYISO auction process. The NYISO-set bid cap for KeySpan is the highest of the three firms, followed by NRG and Astoria.

21. KeySpan possessed market power in the NYC Capacity Market.

22.    There are significant barriers to entry to the NYC Capacity Market. It is difficult and time-consuming to build or expand generating facilities within the region given limited undeveloped space for building or expanding generating facilities and extensive regulatory obligations.

## VI.    KEYSPAN'S PLAN TO AVOID COMPETITION

23.    From June 2003 through December 2005, KeySpan set the market price in the New York City spot auction by bidding its capacity at its cap. Given extremely tight supply and demand conditions, KeySpan needed to withhold only a small amount of capacity to ensure that the market cleared at KeySpan's cap.

24.    KeySpan anticipated that the tight supply and demand conditions in the NYC Capacity Market would change in 2006, due to the entry of approximately 1000 megawatts of new generation. Because of the addition of this new capacity, KeySpan would have to withhold significantly more capacity from the market and would earn substantially lower revenues if it continued to bid all of its capacity at its bid cap. KeySpan anticipated that demand growth and retirement of old generation units would restore tight supply and demand conditions in 2009.

25.    KeySpan could no longer be confident that "bidding the cap" would remain its best strategy during the 2006-2009 period. KeySpan considered various competitive bidding strategies under which it would compete with its rivals for sales by bidding more capacity at lower prices. These strategies could potentially produce much higher returns for KeySpan but carried the risk that competitors would undercut its price and take sales away, making the strategy less profitable than "bidding the cap."

26.    KeySpan also considered acquiring Astoria's generating assets, which were for sale. This would have solved the problem that new entry of capacity posed for KeySpan's

revenue stream, as Astoria's capacity would have provided KeySpan with sufficient additional revenues to make continuing to "bid the cap" its best strategy. KeySpan consulted with defendant Morgan Stanley about acquiring the Astoria assets. KeySpan soon concluded, however, that its acquisition of its largest competitor would raise serious market power issues.

27.    Instead of purchasing the Astoria assets outright, KeySpan decided to acquire a financial interest in substantially all of Astoria's capacity. KeySpan would pay Astoria's owner a fixed revenue stream in return for the revenues generated from Astoria's capacity sales in the auctions.

28.    KeySpan did not approach Astoria directly and instead sought a counterparty to enter into a financial agreement providing KeySpan with payments derived from the market clearing price for an amount of capacity essentially equivalent to what Astoria owned. KeySpan recognized the counterparty would need simultaneously to enter into an agreement with another capacity supplier that would offset the counterparty's payments to KeySpan, and KeySpan knew that Astoria was the only supplier with sufficient capacity to do so. KeySpan turned to the same financial services company that it had consulted about the potential acquisition of Astoria's assets – Defendant Morgan Stanley. Morgan Stanley agreed to serve as the counterparty but, as expected, informed KeySpan that the agreement was contingent upon Morgan Stanley also entering into an offsetting agreement with the owner of the Astoria generating assets.

### VII.   THE AGREEMENTS

29.    On or about January 9, 2006, KeySpan and Morgan Stanley finalized the terms of the KeySpan Swap. Under the agreement, if the market price for capacity was above $7.57 per kW-month, Morgan Stanley would pay KeySpan the difference between the market price and

$7.57 times 1800 MW; if the market price was below $7.57, KeySpan would pay Morgan Stanley the difference times 1800 MW.

30.     The KeySpan Swap was executed on January 18, 2006. The term of the KeySpan Swap ran from May 2006 through April 2009.

31.     On or about January 9, 2006, Morgan Stanley and Astoria finalized the terms of the Astoria Hedge. Under that agreement, if the market price for capacity was above $7.07 per kW-month, Astoria would pay Morgan Stanley the difference times 1800 MW; if the market price was below $7.07, Astoria would be paid the difference times 1800 MW.

32.     The Astoria Hedge was executed on January 11, 2006. The term of the Astoria Hedge ran from May 2006 through April 2009, matching the duration of the KeySpan Swap.

33.     Through the simultaneous KeySpan Swap and Astoria Hedge, KeySpan indirectly acquired an interest in assets of Astoria, its competitor, in the form of a right to revenue generated from Astoria's generating facility with which KeySpan's own generating facility was in direct competition.

34.     In 2006, KeySpan entered into a contract to financially purchase 1,800 MW of capacity in the New York market for three years, paying a fixed price $7.57 per kW-month, settled monthly.

35.     The effect of such acquisition was to substantially lessen competition in the relevant market or to create a monopoly in the relevant market. The agreements and the anticompetitive conduct enabled thereby continued and injured the Plaintiff from approximately May 2006 through at least February 28, 2008.

## VIII.  THE COMPETITIVE EFFECT OF THE KEYSPAN SWAP

36.     The clear tendency of the KeySpan Swap was to alter KeySpan's bidding in the NYC Capacity Market auctions.

37.     Without the Swap, KeySpan likely would have chosen from a range of potentially profitable competitive strategies in response to the entry of new capacity. Had it done so, the price of capacity would have declined. By transferring a financial interest in Astoria's capacity to KeySpan, however, the Swap effectively eliminated KeySpan's incentive to compete for sales in the same way a purchase of Astoria or a direct agreement between KeySpan and Astoria would have done. By providing KeySpan revenues from Astoria's capacity, in addition to KeySpan's own revenues, the Swap made bidding the cap KeySpan's most profitable strategy regardless of its rivals' bids.

38.     After the KeySpan Swap went into effect in May 2006, KeySpan consistently bid its capacity at its cap even though a significant portion of its capacity went unsold. Despite the addition of significant new generating capacity in the NYC Capacity Market, the market price of capacity did not decline.

39.     In August 2007, the State of New York conditioned the sale of KeySpan to a new owner on the divestiture of KeySpan's Ravenswood generating assets and required KeySpan to bid its New York City capacity at zero from March 2008 until the divestiture was completed. Since March 2008, the market price for capacity has declined.

40.     But for the KeySpan Swap, installed capacity would have been procured at a lower price in New York City from at least May 2006 through February 2008.

41.     The KeySpan Swap produced no countervailing efficiencies.

## IX.   THE DEPARTMENT OF JUSTICE'S ANTITRUST ACTION AGAINST KEYSPAN

42.    On approximately May 31, 2007, the United States Department of Justice began an official investigation of KeySpan and Morgan Stanley's conduct alleged herein.

43.    After conducting its investigation which included review of over one million documents, the Department of Justice filed a civil complaint against KeySpan alleging that its conduct alleged herein illegally restrained trade in the NYC Capacity Market in violation of Section 1 of the Sherman Act. Civil Action No. 10-cv-1415 (WHP)(S.D.N.Y.).

44.    Pursuant to a stipulation with the Department of Justice and to avoid further prosecution, KeySpan agreed in that action to the entry of judgment against it stating that the allegations regarding its conduct stated herein state a claim upon which relief may be granted against it under Sections 1 and 4 of the Sherman Act, 15 U.S.C. § § 1 and 4, and agreed to pay a $12 million civil fine to the U.S. Treasury, subject to court approval. The Department of Justice's action against KeySpan remains pending until the court approves the foregoing stipulated judgment.

45.    None of the $12 million civil fine will be used to compensate consumers who were the victims of KeySpan's anticompetitive conduct.

## X.   THE REGULATORY ENVIRONMENT IN WHICH THE PARTIES OPERATE

46.    The price Con Ed paid for capacity during the relevant period was not a rate set by tariff. Morgan Stanley Capital Group Inc. v. P.U.D No 1 of Snohomish County, 128 S. Ct. 2733, 2742 (2008)( "[W]hen a seller files a market-based tariff, purchasers no longer have the option of buying electricity at a rate set by tariff...") (Scalia, J., plurality opinion).

47.     Rather, under applicable government rules and regulation the price Con Ed paid for capacity during the relevant period was determined in individual market auctions by what was supposed to be competitive bidding.

48.     The prices for capacity offered into the auctions by suppliers were neither set by the Federal Energy Regulatory Commission ("FERC") nor reported to FERC prior to the auctions.

49.     Each supplier in the auctions had discretion to select the prices for the capacity it offered into each auction, with the limited exception that the prices offered by KeySpan and certain other generators were subject to a maximum cap imposed by FERC.

50.     Nothing required any generator to offer its supply at the maximum cap price, or prevented any generator from offering its supply at a substantially lower price.

51.     KeySpan, by its actions, illegally restrained trade and thereby intentionally increased the price for electricity in the market auctions as set forth herein.

52.     Under Plaintiff's contract with Con Ed, the market auction price for capacity in effect also set the supply price that Plaintiff was required to pay to Con Ed. KeySpan's illegal conduct directly injured Plaintiff by increasing Plaintiff's supply charges.

53.     KeySpan did not voluntarily, timely and accurately report to FERC the revenue it received in respect of the sale of capacity in the NYC Capacity Market auctions. Specifically, KeySpan did not voluntarily, timely and accurately report to FERC the revenue it received from the sale of capacity by Astoria in the NYC Capacity Market auctions.

54.     KeySpan received substantially greater revenue in respect of the supply of capacity to the NYC Capacity Market during the relevant period than it reported to FERC in its periodic reports to FERC, known as Electric Quarterly Reports.

55.    KeySpan failed to report and file notice of its acquisition of an interest in the assets of Astoria, described herein, with the Federal Trade Commission and the United States Department of Justice under the filing and reporting requirements of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (15 U.S.C. § 18a).

56.    KeySpan failed to report and file notice with FERC of its acquisition of an interest in the assets of Astoria, as described herein, or of the existence of the Astoria Hedge, until almost two years after they had become effective and been in force.

57.    KeySpan intentionally concealed its collusive arrangement involving Astoria's capacity by publicly disclosing only the KeySpan Swap without disclosing the Astoria Hedge, which it knew had been executed and which was essential to its manipulative scheme.

58.    Although questions eventually were raised about the failure of New York City capacity prices to decline as expected and KeySpan's potential involvement therein, KeySpan still failed to disclose the Astoria Hedge.

59.    The Astoria Hedge was not discovered until it was disclosed in a non-public investigation of KeySpan's actions conducted by FERC's Staff between July 6, 2007 and February 28, 2008.

60.    The Astoria Hedge was not disclosed to the general public until the FERC's Staff published its report of its investigation on February 28, 2008.

61.    Defendants' conduct undermines consumers' interest in paying prices for electric capacity that reflect supply and demand and are the result of competitive bidding and free of illegal restraints of trade and acts of monopolization. Up until the time that the Astoria Hedge was fully disclosed and the Department of Justice filed its antitrust complaint against KeySpan, Plaintiff and other customers of Con Edison were deceived into believing that the prices they

paid for electricity reflected the benefits of a competitive marketplace free of illegal restraints of trade and acts of monopolization.

## XI.    CLASS ACTION ALLEGATIONS

62.    Plaintiff brings this action on his own behalf and, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class (the "Class") of all Con Ed customers within the New York City electricity market between January 1, 2006 and January 1, 2009.

63.    Excluded from the Class are KeySpan and Morgan Stanley, any parent, subsidiary, or affiliate of KeySpan or Morgan Stanley; any entity in which KeySpan or Morgan Stanley has or had a controlling interest, or which KeySpan or Morgan Stanley otherwise controls or controlled; and any officer, director, predecessor, successor, or assign of either KeySpan or Morgan Stanley. The Class also excludes all judicial officers presiding over this action and their immediate family members and any juror assigned to this action.

64.    This action is brought as a class action for the following reasons:

a.    The Class consists of at least tens of thousands of persons, and is therefore so numerous that joinder of all members, whether otherwise required or permitted, is impracticable.

b.    There are questions of law or fact common to each class member that predominate over any questions affecting only individual members, including but not limited to:

i.    Whether KeySpan entered into an agreement the likely effect of which has been to increase prices in the NYC Capacity Market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

ii.        Whether KeySpan directly or indirectly acquired assets of a competitor, the effect of which was likely to reduce competition or to create a monopoly in the NYC Capacity Market, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;

iii.        Whether Morgan Stanley entered into an agreement the likely effect of which has been to increase prices in the NYC Capacity Market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ;

iv.        Whether KeySpan attempted and Morgan Stanley conspired to obtain or maintain a monopoly in the NYC Capacity Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

v.        Whether KeySpan and Morgan Stanley entered into an arrangement which restrained trade and increased prices in the NYC Capacity Market in violation of N.Y. Gen. Bus. Law § 340;

vi.        Whether KeySpan and Morgan Stanley have engaged in deceptive acts and practices in violation of N.Y. Gen. Bus. Law § 349;

vii.        Whether KeySpan and Morgan Stanley by engaging in the conduct alleged herein have been unjustly enriched at the expense of Plaintiff and the other members of the Class and are required, in equity and good conscience, to disgorge and pay their ill-gotten gains to Plaintiff and the members of the Class whom they have injured; and

viii.        Whether members of the Class have sustained damages and, if so, the proper measure thereof.

c.        The claims asserted by Plaintiff are typical of the claims of the members of the Class.

d.    Plaintiff will fairly and adequately protect the interests of the Class, and Plaintiff has retained attorneys experienced in class and complex litigation.

e.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy, for at least the following reasons:

i.    Absent a class action, Class members as a practical matter will be unable to obtain redress for KeySpan's and Morgan Stanley's violations of the federal antitrust laws and state law and Class members may be unable to recover the millions of dollars they overpaid during the class period because of KeySpan's and Morgan Stanley's violations of law.

ii.    It would be a substantial hardship for most individual members of the Class if they were forced to prosecute individual actions.

iii.    When the liability of KeySpan and Morgan Stanley has been adjudicated, the Court will be able to determine the damages of all members of the Class;

iv.    A class action will permit an orderly and expeditious administration of the claims asserted, foster economies of time, effort, and expense, and ensure uniformity of decisions; and

v.    The lawsuit presents no difficulties that would unduly impede its management by the Court as a class action.

f.    KeySpan and Morgan Stanley have acted on grounds generally applicable to the Class members.

g.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for all parties.

**COUNT I**
**(Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)**
**Against Defendant KeySpan**

65.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

66.    KeySpan entered into an agreement the likely effect of which has been to increase prices in the NYC Capacity Market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

67.    As a result of KeySpan's conduct, Plaintiff has been injured in his business or property in the form of paying higher and supra-competitive prices for electric capacity.

**COUNT II**
**(Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)**
**Against Defendant Morgan Stanley**

68.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

69.    Morgan Stanley entered into an agreement the likely effect of which has been to increase prices in the NYC Capacity Market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

70.    As a result of Morgan Stanley's conduct, Plaintiff has been injured in his business or property in the form of paying higher and supra-competitive prices for electric capacity.

**COUNT III**
**(Violation of Section 7 of the Clayton Act, 15 U.S.C. § 18)**
**Against Defendant KeySpan**

71.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

72.    KeySpan directly or indirectly acquired assets of its competitor Astoria, the effect of which was likely to reduce competition or to create a monopoly in the NYC Capacity Market, in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

73.    As a result of KeySpan's acquisition and the anticompetitive conduct enabled thereby as set forth herein, Plaintiff has been injured in his business or property in the form of paying higher and supracompetitive prices for electric capacity.

## COUNT IV
### (Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2) Against Defendant KeySpan

74.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

75.    KeySpan by its conduct alleged herein willfully acquired or maintained monopoly power in the form of the ability to materially increase prices in the NYC Capacity Market during the period from 2006 through early 2008, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

76.    KeySpan unlawfully exercised such monopoly power to increase prices during that period.

77.    As a result of such violation, Plaintiff has been injured in his business or property in the form of paying higher and supracompetitive prices for electric capacity.

## COUNT V
### (Attempted Monopolization in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2) Against Defendant KeySpan

78.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

79.     KeySpan by its conduct alleged herein attempted to willfully acquire or maintain monopoly power in the form of the ability to materially increase prices in the NYC Capacity Market during the period from 2006 through early 2008, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

80.     KeySpan's conduct had a dangerous probability of succeeding in acquiring or maintaining such monopoly power, as evidenced by, among other things, the unexpectedly high prices in the NYC Capacity Market during KeySpan's unlawful conduct and the decline of such prices when KeySpan's conduct ceased.

81.     KeySpan engaged in such conduct with the specific intent to acquire or maintain such monopoly power.

82.     As a result of such violation, Plaintiff has been injured in his business or property in the form of paying higher and supracompetitive prices for electric capacity.

**COUNT VI**
**(Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)**
**Against Defendant Morgan Stanley**

83.     Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

84.     Morgan Stanley agreed and conspired with KeySpan to effect KeySpan's acquisition or maintenance of monopoly power in the form of the ability to materially increase prices in the NYC Capacity Market during the period from 2006 through early 2008, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. Morgan Stanley knowingly provided material assistance to further and effect such acquisition or maintenance by, among other things, executing the KeySpan Swap and the Astoria Hedge.

85.    As a result of such violation, Plaintiff has been injured in his business or property in the form of paying higher and supracompetitive prices for electric capacity.

## COUNT VII
### (Violation of N.Y. Gen. Bus. Law Section 340)
### Against KeySpan

86.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

87.    KeySpan entered into a contract, agreement, arrangement or combination whereby a monopoly in the supply of installed capacity in the NYC Capacity Market was or may have been established or maintained, or whereby competition in the market for the supply of installed capacity in the NYC Capacity Market was or may have been restrained, or whereby for the purpose of establishing or maintaining such monopoly or unlawfully interfering with the free exercise of activities in the market for the supply, purchase or sale of such installed capacity, such business was or may have been restrained in violation of N.Y. Gen. Bus. Law Section 340.

88.    As a result of KeySpan's conduct, Plaintiff has been injured in his business or property in the form of paying higher and supracompetitive prices for electric capacity.

## COUNT VIII
### (Violation of N.Y. Gen. Bus. Law Section 340)
### Against Morgan Stanley

89.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

90.    Morgan Stanley entered into a contract, agreement, arrangement or combination whereby a monopoly in the supply of installed capacity in the NYC Capacity Market was or might have been established or maintained, or whereby competition in the market for the supply of installed capacity in the NYC Capacity Market was or may have been restrained, or whereby

for the purpose of establishing or maintaining such monopoly or unlawful interfering with the free exercise of activities in the market for the supply, purchase or sale of such installed capacity, such business was or may have been restrained in violation of N.Y. Gen. Bus. Law Section 340.

91.     As a result of Morgan Stanley's conduct, Plaintiff has been injured in his business or property in the form of paying higher and supracompetitive prices for electric capacity.

## COUNT IX
### (Violation of N.Y. Gen. Bus. Law § 349)
### Against KeySpan

92.     Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

93.     Through its conduct described above, KeySpan has engaged in deceptive acts and practices in the conduct of business, trade and commerce that resulted in injury to Plaintiff and the other members of the Class.

94.     KeySpan both engaged in such deceptive acts and practices and conspired with Morgan Stanley to engage in such acts and practices and willfully took actions in furtherance of such conspiracy.

95.     By reason of the foregoing, KeySpan violated N.Y. Gen. Bus. Law § 349, and Plaintiff and the other members of the Class have been damaged.

## COUNT X
### (Violation of N.Y. Gen. Bus. Law § 349)
### Against Morgan Stanley

96.     Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

97.    Through its conduct described above, Morgan Stanley has engaged in deceptive acts and practices in the conduct of business, trade and commerce that resulted in injury to Plaintiff and the other members of the Class.

98.    Morgan Stanley both engaged in such deceptive acts and practices and conspired with KeySpan to engage in such acts and practices and willfully took actions in furtherance of such conspiracy.

99.    By reason of the foregoing, KeySpan violated N.Y. Gen. Bus. Law § 349, and Plaintiff and the other members of the Class have been damaged.

## COUNT XI
### (Unjust Enrichment)
### Against All Defendants

100.    Plaintiff incorporates the allegations of all other paragraphs of this Complaint as though set forth herein.

101.    KeySpan and Morgan Stanley entered into an agreement the effect of which has been to increase electricity prices in the NYC Capacity Market resulting in undue profits to KeySpan and Morgan Stanley for engaging in unlawful activity. By engaging in the conduct described above, Defendants have been unjustly enriched at the expense of Plaintiff and the other members of the Class and they are required, in equity and good conscience, to disgorge and pay their ill-gotten gains to Plaintiff and the members of the Class whom they have injured.

102.    By reason of the foregoing, Defendants are liable to Plaintiff and the other members of the Class for the amount of their ill-gotten gains received from their illegal actions set forth herein, the amount of such gains to be determined at trial.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment against Defendants as

follows:

    a.      Certifying this action as a class action, with a class as defined above;

    b.      Adjudging and decreeing that Defendants have engaged in conduct in violation of Sections 1 and 2 of the Sherman Act, as amended, 15 U.S.C. §§ 1 and 2, Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, N.Y. Gen. Bus. Law Section 340 and N.Y. Gen. Bus. Law Section 349;

    c.      On Plaintiff's First, Third, Fourth and Fifth Counts, awarding against KeySpan the damages that Plaintiff and the other members of the Class have suffered as a result of KeySpan's actions, the amount of such damages to be determined at trial, but in any event, not less than One Hundred Eighteen Million Dollars ($118 million), trebled, plus interest, costs and attorneys' fees;

    d.      On Plaintiff's Second, and Sixth Counts, awarding against Morgan Stanley the damages that Plaintiff and the other members of the Class have suffered as a result of Morgan Stanley's actions, the amount of such damages to be determined at trial, but in any event, not less than One Hundred Eighteen Million Dollars ($118 million), trebled, plus interest, costs and attorneys' fees;

    e.      On Plaintiff's Seventh Count, awarding against KeySpan the damages that Plaintiff and the other members of the Class have suffered as a result of KeySpan's actions, the amount of such damages to be determined at trial, but in any event, not less than One Hundred Eighteen Million Dollars ($118 million), trebled under N.Y. Gen. Bus. Law Section 340, plus interest, costs not exceeding $10,000 and attorneys' fees;

    f.      On Plaintiff's Eighth Count, awarding against Morgan Stanley the damages that Plaintiff and the other members of the Class have suffered as a result of Morgan Stanley's

actions, the amount of such damages to be determined at trial, but in any event, not less than One Hundred Eighteen Million Dollars ($118 million), trebled under N.Y. Gen. Bus. Law Section 340, plus interest, costs not exceeding $10,000 and attorneys' fee;

g.    On Plaintiff's Ninth Count, awarding against KeySpan the damages that Plaintiff and the other members of the Class have suffered as a result of KeySpan's actions, the amount of such damages to be determined at trial, but, in any event, not less than One Hundred Eighteen Million Dollars ($118 million), or in the alternative and at Plaintiff's and the other Class members' election $50 per member as provided in N.Y. Gen. Bus. Law Section 349, trebled in accordance with and subject to the limitations of N.Y. Gen. Bus. Law Section 349, plus interest and attorneys' fees;

h.    On Plaintiff's Tenth Count, awarding against Morgan Stanley the damages that Plaintiff and the other members of the Class have suffered as a result of KeySpan's actions, the amount of such damages to be determined at trial, but, in any event, not less than One Hundred Eighteen Million Dollars ($118 million), or in the alternative and at Plaintiff's and the other Class members' election $50 per member as provided in N.Y. Gen. Bus. Law Section 349, trebled in accordance with and subject to the limitations of N.Y. Gen. Bus. Law Section 349, plus interest and attorneys' fees;

i.    On Plaintiff's Eleventh Count, declaring that by engaging in the conduct described herein, Defendants have been unjustly enriched at the expense of Plaintiff and the other members of the Class and that they are enjoined and prohibited from engaging in such conduct in the future and are required, in equity and good conscience, to disgorge and pay their ill-gotten gains to Plaintiff and the members of the Class whom they have injured by their conduct to date; and

j.    Awarding Plaintiff and the Class Members such other and further relief to which

they may be legally entitled and such other and further relief as this Court deems just and proper.

### Jury Demand

TRIAL BY JURY IS DEMANDED ON ALL COUNTS SO TRIABLE.

Dated: New York, New York
        July 16, 2010

**ABBEY SPANIER RODD & ABRAMS LLP**

By: _____

Judith L. Spanier
jspanier@abbeyspanier.com
Karin Fisch
kfisch@abbeyspanier.com
Natalie S. Marcus
nmarcus@abbeyspanier.com
212 East 39th Street
New York, New York   10016
Tel.:   212-889-3700
Fax:    212-684-5191

**LAW OFFICE OF DANIEL J. SPONSELLER**
Daniel J. Sponseller
dsponseller@sponsellerlawfirm.com
409 Broad Street, Suite 200
Sewickley, Pennsylvania  15143
Tel.:   412-741-4422
Fax:    412-741-4433

Attorneys for Plaintiff and the Proposed Class