UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

CHARLES SIMON, on behalf of himself and
all others similarly situated,

               **Plaintiff,**

    - against -

KEYSPAN CORPORATION and
MORGAN STANLEY CAPITAL GROUP
INC.,

               **Defendants.**
------------------------------------------------------X

**OPINION AND ORDER**

**10 Civ. 5437  (SAS)**



SHIRA A. SCHEINDLIN, U.S.D.J.:

       Charles Simon ("Simon" or "plaintiff") brings this action against

Keyspan Corporation ("Keyspan") and Morgan Stanley Capital Group Inc.

("Morgan Stanley") (collectively, the "defendants") pursuant to Section 4 of the

Clayton Antitrust Act (the "Clayton Act") on his own behalf and on behalf of other

similarly situated consumers.[1]  Simon is a retail consumer of electricity in New

York City.  Keyspan is a provider of wholesale electricity and electricity

generating capacity ("ICAP" or "installed capacity").[2]  Morgan Stanley is a

---

[1]     Section 4 of the Clayton Act states that "any person who shall be
injured in his business or property by reason of anything forbidden in the antitrust
laws may sue therefor" for treble damages.  15 U.S.C. § 15.

[2]     Installed capacity is a regulatory measure of electric generation
capability.  KeySpan is the largest seller of electricity generating capacity

provider of financial services.  Plaintiff alleges that by entering into a financial

transaction referred to as the "KeySpan Swap,"[3] Keyspan and Morgan Stanley

violated the following statutes: Section 1 of the Sherman Act;[4] Section 2 of the

Sherman Act;[5] Section 7 of the Donnelly Act;[6] and Section 349 of the New York

General Business Law.[7]  Plaintiff also alleges that Keyspan violated Section 7 of

the Clayton Act[8] and that both defendants were unjustly enriched at his expense.

_____

("installed capacity") in the New York City market (the "NYC Capacity Market").

[3]       For a detailed description of the KeySpan Swap, and the related "Astoria Hedge," *see infra* Part II.B.

[4]       Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, . . . is illegal."  15 U.S.C. § 1.

[5]       Section 2 of the Sherman Act states that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ."  15 U.S.C. § 2.

[6]       The Donnelly Act declares illegal and against public policy any agreement or monopoly in the conduct of any business or trade whereby competition or the free exercise of any activity in the conduct of any business is retrained.  *See* N.Y. Gen. Bus. Law § 340.

[7]       Section 349 of the New York General Business Law makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or furnishing of any service."  N.Y. Gen. Bus. Law § 349(a).

[8]       Section 7 of the Clayton Act provides, in relevant part, that "[n]o person engaged in commerce . . . shall acquire, directly or indirectly, the whole or

Defendants move to dismiss the Complaint, in its entirety, on the following grounds: (1) the filed rate doctrine; (2) the doctrine of implied repeal; (3) lack of standing/antitrust injury; (4) field and conflict preemption; and (5) failure to allege facts sufficient to state a plausible claim upon which relief may be granted. For the reasons that follow, defendants' motion is granted and the Complaint is dismissed in its entirety, with prejudice and without leave to amend.

## I.   BACKGROUND[9]

### A.   The NYC Installed Capacity Market and the Governing Regulatory Scheme

Congress empowered the Federal Energy Regulatory Commission

---

any part of the stock or other share capital . . . [or] the whole or any part of the assets of another person engaged also in commerce . . . [where] the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18.

[9]   Large portions of this section were taken, often verbatim, from defendants' moving brief. *See generally* Memorandum of Law in Support of Defendants' Joint Motion to Dismiss at 5-9.

An explanation of the New York City Installed Capacity Market and the governing regulatory scheme is needed to understand how the wholesale electricity market operates. In providing this explanation, I cite various regulatory orders of which I have taken judicial notice. Courts may take judicial notice of matters of public record and routinely do so when evaluating motions to dismiss that require an assessment of a federal regulatory scheme. *See, e.g., D'Alessio v. New York Stock Exch., Inc.*, 258 F.3d 93, 95-98 (2d Cir. 2001) (evaluating applicable regulations and government investigations); *Marcus v. AT&T Corp.*, 138 F.3d 46, 56 (2d Cir. 1998) (analyzing applicable tariffs in evaluating filed rate defense on a motion to dismiss).

("FERC" or the "Commission"), an independent commission, with plenary and exclusive authority over wholesale electricity markets under the Federal Power Act ("FPA").[10]  In particular, section 201 of the FPA[11] delegates to FERC the "exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce."[12]  Sellers of retail electricity, such as Consolidated Edison Company of New York, Inc. ("Con Ed"), must purchase a product from electricity generators known as "installed capacity."  "Installed capacity" does not represent an actual unit of physical energy.  Rather, it is a regulatory construct created by the New York Independent System Operator ("NYISO") that measures the "capability to generate or transmit electrical power," in units that wholesale electricity buyers like Con Ed must buy to ensure stable sources of supply.[13]

---

[10]    16 U.S.C. § 824 *et seq.*

[11]    *See id.* § 824d.

[12]    *New England Power Co. v. New Hampshire*, 455 U.S. 331, 340 (1982). *Accord Nantahala Power & Light Co. v. Thornburg*, 476 U.S. 953, 962 (1986).

[13]    *New York Independent Sys. Operator, Inc.*, Order Conditionally Approving Proposal, FERC Docket No. EL07-39-000, 122 FERC ¶ 61,211, at ¶ 2 n.1 (Mar. 7, 2008) (the "FERC Order") (stating that the market for installed capacity, which is "[t]he capability to generate or transmit electrical power, measured in megawatts ('MW')," is distinct from the market for "energy," which is "[the] quantity of electricity that is bid, produced, purchased, consumed, sold, or transmitted over a period of time, and measured or calculated in megawatt hours") (quotation marks omitted, alterations in original).

FERC requires retail sellers of electricity such as Con Ed, who are called "Load Serving Entities" or "LSEs," to purchase installed capacity from suppliers such as KeySpan.[14] These Load Serving Entities are required to make installed capacity payments that relate to their expected peak demand plus a share of reserve capacity.[15] These payments provide energy suppliers such as KeySpan with a revenue stream sufficient to encourage the construction of new energy generating facilities, as needed, and maintain adequate and reliable sources of electricity.[16]

FERC created and regulates the New York City Installed Capacity Market (hereinafter, the "NYC Capacity Market") pursuant to its exclusive authority over the "transmission of electric energy in interstate commerce" and the "sale of electric energy at wholesale in interstate commerce" by public utilities.[17] Congress vested FERC with the power to determine whether wholesale electricity

_____   _____

[14]     FERC Order ¶ 2.

[15]     *See id.*

[16]     *See Consolidated Edison Co. of N.Y., Inc.*, Order Accepting Market Power Mitigation Measures, as Modified, For Filing, FERC Docket No. ER98-3169-000, 84 FERC ¶ 61,287, at ¶¶ 62,356-62,358 (Sept. 22, 1998) (the "Mitigation Order").

[17]     16 U.S.C. § 824(b)(1). *See also New England Power Co.,* 455 U.S. at 340.

rates are "just and reasonable" and not unduly discriminatory or preferential.[18]

FERC's plenary authority also extends to any "practice" or "contract" that affects a

jurisdictional rate.[19]  Because capacity is part of the "sale of electric energy at

wholesale," FERC's authority encompasses capacity markets as well as any

"practices" or "contracts" that could affect those markets.[20]

The price for installed capacity is set through FERC-approved market

auctions administered by the NYISO.  FERC regulates these auctions through its

approval of, and ongoing modifications to, the New York Independent System

Operator  Market Administration and Control Area Services Tariff (the "NYISO

Tariff").[21]  The NYISO Tariff sets the rules for conducting auctions, authorizes the

---

[18]    *Id.* §§ 824d(a)-(b), 824e(a).  *See also Mississippi Power & Light Co. v. Mississippi*, 487 U.S. 354 (1988).

[19]    *See* 16 U.S.C. § 824e(a) (emphasis added).

[20]    *See Maine Pub. Utils. Comm'n v. FERC*, 520 F.3d 464, 479 (D.C. Cir. 2008) (upholding FERC's regulatory jurisdiction over rates, charges and "pricing issues" in capacity markets under its "broad authority" under the FPA), *rev'd in part on other grounds sub nom. NRG Power Mktg., LLC v. Maine Pub. Utils. Comm'n*, 130 S. Ct. 693 (2010).  *See also Hunter v. FERC*, 527 F. Supp. 2d 9, 17 n.6 (D.D.C. 2007) (stating that FERC's enforcement authority extends to financial derivative contracts impacting a FERC jurisdictional market and can "reach *any* entity that directly or indirectly engages in manipulative practices" impacting such markets) (emphasis in original).

[21]    *See* New York Independent System Operator, Inc., FERC Electric Tariff, Orig. Vol. No. 2.

prices that suppliers can offer in the auctions, and specifies how the offer prices at auction are used to determine the prices that LSEs pay for installed capacity. In each auction, capacity suppliers offer price and quantity bids. Supplier bids are "stacked" from lowest to highest priced and then compared to the total amount of capacity demanded in a particular auction. The offering price of the last and highest bid in the "stack" needed to meet the total demand establishes the market price for all of the capacity bid in that auction. Capacity bid at a price higher than this market price is unsold.

FERC authorized the rate that KeySpan, under the NYISO Tariff, could offer capacity in the NYC Capacity Market auctions. Specifically, FERC authorized KeySpan to offer its capacity at or below FERC-specified price caps, otherwise known as "bid caps," which set the highest price KeySpan could charge during the relevant time period.[22] At the time FERC approved these rates, it expressly stated that it expected KeySpan to "bid the price cap and set the market clearing price at that level even as new generation is added and supply increases."[23]

Because of constraints limiting the amount of energy that can be imported into the New York City area from the power grid, the NYISO requires

---

[22]     *See id.* Art. V and Attachment H (ISO Market Power Mitigation Measures).

[23]     Mitigation Order ¶ 62,357 n.17.

7

sellers of retail electricity (like Con Ed) to purchase eighty percent of their capacity from generators in the New York City region.[24]  Thus, at all relevant times, the NYC Capacity Market was highly concentrated with three companies – KeySpan, NRG Energy, Inc. ("NRG"), and Astoria Generating Company ("Astoria") – controlling a substantial portion of generating capacity.[25]  These companies, which were subject to bid caps for nearly all of their generating capacity in New York City, were not allowed to sell that capacity outside of the NYISO auction process. The NYISO-set bid cap for Keyspan was the highest, followed by NRG and Astoria.

### B.    KeySpan's Market-Based Filed Rate Approval

FERC also governs the NYC Capacity Market through separate "market-based rate tariffs" ("MBR Tariffs") that each seller must file and have approved by FERC as a condition to selling capacity and wholesale electricity, whether such sales are made through market auctions or through independently

---

[24]     Con Ed purchased capacity in the NYC Capacity Market during the period 2006 through 2009.  For a large portion of this period – from May 2006 through February 2008, Con Ed passed through to its consumers one hundred percent of its costs for the purchase of installed capacity.  *See* Complaint ¶ 7.

[25]     "As major electricity generators, the three firms were designated by [FERC] as 'pivotal suppliers,' meaning a portion of each firm's output was vital to satisfy capacity demand."  *United States v. KeySpan Corp.*, No. 10 Civ. 1415, 2011 WL 338037, at *1 (S.D.N.Y. Feb. 2, 2011) ("Memorandum & Order").

negotiated contracts with LSEs.   Instead of issuing rate schedules or rate-fixing contracts, the MBR Tariffs "simply state that the seller will enter into freely negotiated contracts with purchasers."[26]  The MBR Tariffs authorize a seller to determine its prices for both capacity and wholesale electricity, subject to the conditions set forth in the MBR Tariff, the NYISO Tariff, and FERC's other rules and regulations.  FERC will approve an MBR Tariff only if a seller complies with extensive FERC filing and related requirements and can demonstrate that it either lacks market power or has market power that has been adequately mitigated such that it cannot unjustly or unreasonably impact market prices.[27]

Market-based rate sellers also are required to adhere to specific conduct rules, including the obligation to "bid supply in a manner that complies

---

[26]     *Capital Group Inc. v. Public Util. Dist. No. 1 of Snohomish County, Wash.*, 554 U.S. 527, 537 (2008) (citing *Market-Based Rates for Wholesale Sales of Electric Energy, Capacity and Ancillary Services By Public Utilities*, Order No. 697, 72 Fed. Reg. 39904 (2007).  *See id.* at 538 ("[W]hen a seller files a market-based tariff, purchasers no longer have the option of buying electricity at a rate set by tariff and contracts no longer need to be filed with FERC (and subjected to its investigatory power) before going into effect.").

[27]     *See California ex rel. Lockyer v. FERC*, 383 F.3d 1006, 1009 (9th Cir. 2004) ("A condition of FERC's approval of an entity's market-based rate authority was a FERC determination that the entity lacked, or had adequately mitigated market power in the [capacity] markets.  FERC conducted these inquiries as a means of carrying out its statutory mandate under the Federal Power Act to ensure 'just and reasonable' wholesale rates for electricity." (citing 16 U.S.C. § 824d(a)).  *See also* C.F.R. Title 18, Ch. I, Subch. B, Pt. 35, Subpt. H (Wholesale Sales of Electric Energy, Capacity and Ancillary Services at Market-Based Rates).

with the Commission-approved rules and regulations of the applicable power

market," and refrain from engaging in "actions or transactions . . . that are intended

to or foreseeably could manipulate market prices, market conditions, or market

rules for electric energy or electricity products."[28] After Congress vested FERC

with specific anti-manipulation enforcement authority under the Energy Policy Act

of 2005, FERC issued a rule prohibiting any entity from engaging in fraudulent or

deceptive conduct in connection with the purchase or sale of electricity.[29]

Compliant with these requirements, KeySpan was authorized by FERC to sell

capacity and wholesale electricity pursuant to its MBR Tariff.[30]

## C.    FERC's Review of the Keyspan Swap

FERC conducted a comprehensive review of the Capacity Market that

included an assessment of the Keyspan Swap and its potential impact on the

---

[28]     *Investigation of Terms and Conditions of Public Utility Market-Based Rate Authorizations*, Order on Rehearing, FERC Docket No. EL01-118-003, 107 FERC ¶ 61,175, at *7, *11 (May 19, 2004).

[29]     *See* 18 C.F.R. § 1c.2(a).

[30]     *See, e.g., KeySpan-Ravenswood, LLC, KeySpan-Glenwood Energy Center, LLC, & KeySpan-Port Jefferson Energy Center, LLC*, Order Accepting Updated Market Power Analysis and Revised Market-Based Rate Tariff Sheets, FERC Docket Nos. ER02-1398 et al., 113 FERC ¶ 61,196, at ¶ 21 (Nov. 22, 2005) (the "FERC MBR Order") (finding that "KeySpan has sufficiently mitigated its generation market power and that KeySpan satisfies the Commission's generation market power standard for the grant of market-based rate authority").

Capacity Market.  FERC concluded that KeySpan and Morgan Stanley acted

lawfully and that prices in the auctions were authorized under the NYISO Tariff

and consistent with FERC's expectations.[31]   FERC therefore concluded that there

was no basis on which to order any refunds or restitution to Con Ed (or any other

purchasers in the auctions).[32]

   In conjunction with these proceedings, FERC ordered its Enforcement

Staff to investigate the "issue of whether any entity has engaged in manipulation of

the [Capacity Market]."[33]   Among the matters considered by FERC was whether

the Keyspan Swap caused KeySpan to "consistently offer[] its capacity at its bid

cap and, as a result, raise[] prices in [the capacity] market."[34]   This included an

assessment of whether KeySpan engaged in "economic withholding" of its

capacity in violation of FERC's anti-manipulation regulations, *i.e.*, whether

KeySpan offered its capacity "at a sufficiently high price" such that it would not

---

[31]  *See* FERC Order ¶ 145.

[32]  *See id.* ¶ 146.

[33]  *New York Independent Sys. Operator, Inc.*, Order Establishing Paper Hearing and Referring Certain Matters for Investigation, FERC Docket No. EL07-39-000, 120 FERC ¶ 61,024, at ¶ 1 (July 6, 2007).

[34]  *FERC Enforcement Staff Report*, Findings of a Non-Public Investigation of Potential Market Manipulation by Suppliers in the New York City Capacity Market, Docket Nos. IN08-2-000 & EL07-39-000, at 2 (Feb. 28, 2008) ("FERC Staff Report").

sell all of its capacity and "as a result, the market clearing price [was] raised."[35]

In February 2008, FERC's Enforcement Staff submitted a 24-page report detailing its findings that no such unlawful withholding occurred and that the Keyspan Swap was a lawful and legitimate transaction that had no impact on the Capacity Market.[36] FERC's Enforcement Staff found that:

> Market participants in the in-city ICAP market have always known that KeySpan, pursuant to the applicable market rules, was permitted to offer capacity at its cap and, thereby, set the market-clearing price. In addition, as noted, KeySpan's offering behavior was consistent with market rules and the Commission's announced expectation that [suppliers], such as KeySpan, would (in the absence of sufficient capacity additions) offer their capacity at their caps. Furthermore, KeySpan's swap was not deceitful or hidden; KeySpan publicly disclosed the terms and conditions of its swap shortly after executing it.[37]

FERC included the FERC Staff Report as part of its adjudicatory record and ordered that the market manipulation investigation be closed without further action.[38] FERC confirmed the findings of the FERC Report, concluding that the prices for electric capacity "were not only permissible under the [NYISO

---

[35]    *Id.*

[36]    *See id.* at 2-3.

[37]    *Id.* at 17.

[38]    *See* FERC Order ¶ 149.

Tariff] but consistent with the Commission's expectations when it [set the price caps in 1998]."[39]   FERC concluded that "neither the [NYISO] tariff nor the Commission's regulations were violated"[40] and that KeySpan's "bidding behavior in this case did not violate the filed rate."[41]

Based on these findings, FERC denied the request by Con Ed and others for refunds on the prices paid for capacity in the auctions that are the subject of the instant Complaint.  FERC found there was no basis on which to order any refunds and that any such restitution would "create substantial uncertainty in the market and undermine confidence in [it]," particularly because of the "impossibility of predicting and restoring what might have happened in the market under an alternative set of circumstances."[42]   FERC also reasoned that "ordering refunds would not help achieve the goals of [the Capacity Market]."[43]

---

[39]     *Id.* ¶ 145.

[40]     *Id.*

[41]     *Id.* ¶ 146.

[42]     *Id.* ¶ 147.

[43]     *Id.* ¶¶ 147-148.

13

## II.   PLAINTIFF'S ALLEGATIONS[44]

### A.   KeySpan's Plan to Avoid Competition

Between 2003 and 2006, purchasers of installed capacity (like Con Ed) required almost all of KeySpan's output to meet expected demand.[45] Because of this heightened demand, KeySpan's ability to set price levels was limited only by the regulatory ceiling set by the "bid cap."[46] As a result, KeySpan set the market price in the capacity auctions by bidding its capacity at its bid cap.[47] KeySpan anticipated that market conditions in the NYC Capacity Market would change in 2006, due to the entry of approximately 1000 megawatts of generation.[48]

---

[44]   Large portions of this section were taken, often verbatim, from plaintiff's opposition brief. *See generally* Plaintiff's Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss the Complaint at 2-7.

[45]   The prices that KeySpan charged electricity retailers like Con Ed were set by market forces, not  by tariff. *See* Complaint ¶¶ 46-47. Furthermore, the prices for installed capacity offered by suppliers in purportedly competitive bidding were neither set by FERC nor reported to FERC prior to the auctions. *See id.* ¶ 48.

[46]   *See* Complaint ¶ 2 ("Indeed, the market price for capacity was consistently at or near KeySpan's bid cap, enabling KeySpan to sell virtually all of its capacity at the bid cap prices.").

[47]   *See id.* ¶ 23 ("Given extremely tight supply and demand conditions, KeySpan needed to withhold only a small amount of capacity to ensure that the market cleared at KeySpan's [bid] cap," the highest possible price.).

[48]   *See id.* ¶ 24. "Two large, new electricity generation plants were slated to come on line in 2006 (with no exit expected until at least 2009), breaking the capacity shortage that had kept prices at the capped levels." *Id.* ¶ 3.

"Because of the addition of this new capacity, KeySpan would have to withhold significantly more capacity from the market and would earn substantially lower revenues if it continued to bid all of its capacity at its bid cap."[49]  KeySpan expected tight supply and demand conditions would resume in 2009.[50]

No longer confident that "bidding the cap" would remain its best strategy, Keyspan considered various competitive bidding strategies such as competing for sales by bidding more capacity at lower prices.[51]  Although this strategy could have potentially yielded much higher returns for KeySpan, it carried the risk that competitors would undercut Keyspan's price and take sales away from Keyspan, thereby making it less profitable than "bidding the cap."[52]

KeySpan also considered acquiring the generating assets of one of its competitors, Astoria, which happened to be for sale.[53]  "Astoria's capacity would have provided KeySpan with sufficient additional revenues to make continuing to 'bid the cap' its best strategy."[54]  KeySpan consulted with Morgan Stanley about

---

[49]     *Id.* ¶ 24.

[50]     *See id.*

[51]     *See id.* ¶ 25.

[52]     *See id.*

[53]     *See id.* ¶ 26.

[54]     *Id.*

15

acquiring Astoria's assets but concluded that the acquisition of its largest competitor would raise "serious market power issues."[55]  Instead of purchasing Astoria's assets outright, KeySpan decided to acquire a financial interest in substantially all of Astoria's capacity.[56]  Keyspan would pay Astoria "a fixed revenue stream in return for the revenues generated from Astoria's capacity sales in the auctions."[57]

Rather than approach Astoria directly, KeySpan turned to Morgan Stanley to "to enter into a financial agreement providing KeySpan with payments derived from the market clearing price for an amount of capacity essentially equivalent to what Astoria owned."[58]  Morgan Stanley agreed to serve as the counterparty to this agreement, the "KeySpan Swap," contingent upon Morgan Stanley entering into an offsetting agreement with Astoria - the so-called "Astoria Hedge."[59]

---

[55]     *Id.*

[56]     *See id.* ¶ 27.

[57]     *Id.*

[58]     *Id.* ¶ 28.

[59]     *See id.*

### B.  The KeySpan Swap and Astoria Hedge Agreements

On January 9, 2006, KeySpan and Morgan Stanley finalized the terms of the KeySpan Swap.[60]  Under that agreement, if the market (floating) price for installed capacity, determined by the NYISO demand curve spot auction, was above \$7.57 per kW-month (the fixed price), Morgan Stanley would pay KeySpan the difference between the market price and \$7.57 times 1800 megawatts ("MW"); if the market price was below \$7.57, KeySpan would pay Morgan Stanley the difference times 1800 MW.[61]  The KeySpan Swap, executed on January 18, 2006, ran from May 2006 through April 2009.[62]

On January 9, 2006, Morgan Stanley and Astoria finalized the terms of the Astoria Hedge.[63]  Under that agreement, if the market price for installed capacity was above \$7.07 per kW-month, Astoria would pay Morgan Stanley the difference times 1800 MW; if the market price was below \$7.07, Morgan Stanley would pay Astoria the difference times 1800 MW.[64]  The Astoria Hedge, executed

---

[60]  *See id.* ¶ 29.

[61]  *See id.*  KeySpan owned approximately 2400 MW of its own electricity generating capacity at its Ravenswood electrical generation facility, located in New York City.

[62]  *See id.* ¶ 30.

[63]  *See id.* ¶ 31.

[64]  *See id.*

17

on January 11, 2006, ran from May 2006 through April 2009, the same duration as the KeySpan Swap.[65]

As a result of the KeySpan Swap and Astoria Hedge (collectively, the "Agreements"), Morgan Stanley earned the $.50 price differential between the two contracts regardless of the prices at which the auctions cleared in any given month. For example, if the floating or market price for installed capacity was $7.40/kW-month, KeySpan would pay Morgan Stanley $.17 x 1800 MW under the KeySpan Swap ($7.57/kW-month - $7.40/kW-month) while Astoria would pay Morgan Stanley $.33 x 1800 MW under the Astoria Hedge ($7.40/kW-month - $7.07/kW-month). If the floating price was $8.00/kW-month, Morgan Stanley would pay KeySpan $.43 x 1800 MW while Astoria would pay Morgan Stanley $.93 x 1800 MW. If the floating price was $6.00/kW-month, KeySpan would pay Morgan Stanley $1.57 x 1800 MW and Morgan Stanley, in turn, would pay Astoria $1.07 x 1800 MW. Thus, Astoria was locked into the fixed price of $7.07/kW-month under the Astoria Hedge. KeySpan was not locked into a fixed price under the KeySpan Swap. Rather, under the KeySpan Swap, KeySpan's revenue increased in direct proportion to increases in the floating price, so long as the floating price

---

[65]     *See id.* ¶ 32.

18

exceeded $7.57/kW-month. [66]

## C.    The Anti-Competitive Effect of the Agreements

Con Ed, which purchased installed capacity in the NYC Capacity

Market from 2006 through 2009, "passed through" one hundred percent of its costs

for installed capacity to its customers, individual consumers of retail electricity.[67]

The purpose of the Agreements was to allow KeySpan to alter its bidding in the

NYC Capacity Market auctions.[68]  According to plaintiff, without the Agreements,

> KeySpan likely would have chosen from a range of
> potentially profitable competitive strategies in response to
> the entry of new capacity.  Had it done so, the price of
> capacity would have declined.  By transferring a financial
> interest in Astoria's capacity to KeySpan, however, the
> [KeySpan] Swap effectively eliminated KeySpan's
> incentive to compete for sales in the same way a purchase
> of Astoria or a direct agreement between KeySpan and
> Astoria would have done.  By providing KeySpan revenues
> from Astoria's capacity, in addition to KeySpan's own
> revenues, the [KeySpan] Swap made bidding the cap
> KeySpan's most profitable strategy regardless of its rival's
> bids.[69]

---

[66]    KeySpan did not advise FERC of the revenues it received under the
KeySpan Swap. *See id.* ¶ 53.

[67]    *See id.* ¶ 7 ("[Con Ed's] customers, including Plaintiff, were
contractually required to pay and did pay 100% of such costs as 'supply charges'
on their monthly billing statements.").

[68]    *See id.* ¶ 36.

[69]    *See id.* ¶ 37.

After the Agreements went into effect in May 2006, KeySpan consistently offered its capacity at its bid cap even though a significant portion of its capacity went unsold.[70] Consequently, "[d]espite the addition of significant new generating capacity in the NYC Capacity Market, the market price of capacity did not decline."[71]

In sum, "[b]ut for the KeySpan Swap, installed capacity would have been procured at a lower price in New York City from at least May 2006 through February 2008."[72] Thus, "[t]he likely effect of the KeySpan Swap was increased capacity prices for the retail electricity suppliers [Con Ed] who purchased capacity, and, in turn, pass[ed] increased supply prices directly to consumers [Simon] who pay for electricity."[73]

---

[70]   *See id.* ¶ 38. KeySpan's decline in revenue resulting from unsold capacity was offset by the payments it received from Morgan Stanley under the KeySpan Swap. KeySpan thus had the incentive to drive up market prices by withholding its own capacity, thereby increasing the price differential payments due under the KeySpan Swap and recouping any lost revenue resulting from a decline in its own sales. KeySpan apparently thought that this was its best profit maximizing strategy.

[71]   *Id.*

[72]   *Id.* ¶ 40.

[73]   *Id.* ¶ 1.

**D.      The Department of Justice Antitrust Action Against KeySpan**

In May 2007, the Department of Justice ("DOJ") began an official investigation of KeySpan's conduct.[74]  Upon the completion of the DOJ investigation, the United States, acting through the Attorney General, brought a civil antitrust action against KeySpan.[75]   In that action, it was alleged that "KeySpan entered into an agreement the likely effect of which has been to increase prices in the NYC Capacity Market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1."[76]  Pursuant to a stipulation with the DOJ, KeySpan agreed to the entry of a Final Judgment requiring it to pay a $12 million civil fine to the U.S. Treasury.[77]

The Final Judgment, entered on February 2, 2011, states that KeySpan "consented to entry of this Final Judgment, without trial or adjudication of any issue of fact or law, for settlement purposes only, and without this Final Judgment constituting any evidence against or an admission by KeySpan with respect to any

---

[74]      *See id.* ¶ 42.

[75]      *See id.* ¶ 43.

[76]      Complaint, Civil Action No. 10-cv-1415 (WHP) ¶ 37.

[77]      *See* Complaint ¶ 44.

allegation contained in the Complaint[.]"[78]  In the Order accompanying the Final

Judgment, Judge William H. Pauley notes that "[a]ccording to the Government,

from May 2006 to April 2008, KeySpan earned approximately $49 million in net

revenues under the [KeySpan] Swap."[79]  Despite the magnitude of KeySpan's

Swap revenue, Judge Pauley "defers to the Government's conclusion that

restitution – i.e., making New York City consumers whole – is likely

unavailable."[80]

## III.    LEGAL STANDARDS

### A.    Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and

plain statement of the claim showing that the pleader is entitled to relief.'"[81]  When

deciding a motion to dismiss under Rule 12(b)(6), a court must "accept as true all

of the factual allegations contained in the complaint"[82] and "draw all reasonable

_____

[78]    Final Judgment, docketed on February 2, 2011, Document # 40 in case 1:10-cv-01415-WHP.

[79]    Memorandum & Order, 2011 WL 338037, at *2.

[80]    *Id.* at *6.

[81]    *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[82]    *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007).

inferences in plaintiff's favor."[83]  This assumption of truth, however, does not

apply to allegations that are no more than legal conclusions.[84]  "Therefore, 'a court

considering a motion to dismiss can choose to begin by identifying pleadings that,

because they are no more than conclusions, are not entitled to the assumption of

truth.'"[85]

     In order to survive a motion to dismiss, the allegations in the

complaint must meet the standard of "plausibility."[86]  The test is no longer whether

there is "no set of facts" that a plaintiff could prove "which would entitle him to

relief."[87]  This new plausibility standard has been aptly summarized by the Second

Circuit, as follows:

> Generally, "[w]hile a complaint attacked by a Rule 12(b)(6)
> motion to dismiss does not need detailed factual
> allegations, a plaintiff's obligation to provide the grounds

---

[83]    *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298
(2d Cir. 2006).

[84]    *See Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 317 n.1 (2d Cir.
2010).

[85]    *Id.* (quoting *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1950
(2009)).

[86]    *See Bell Atlantic*, 127 S. Ct. at 1970.

[87]    *Id.* at 1969 (quoting *Conley v. Gibson*, 355 U.S. 45-46 (1957)) ("The
phrase is best forgotten as an incomplete, negative gloss on an accepted pleading
standard: once a claim has been stated adequately, it may be supported by showing
any set of facts consistent with the allegations in the complaint.").

of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955 (internal quotation marks omitted) (alteration in original) (citations omitted). Instead, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted). What is required are "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. In the words of the Supreme Court's most recent iteration of this standard, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1949 (2009). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," however, dismissal is appropriate. *Id.* at 1950.[88]

## B.   Standing/Antitrust Injury

A challenge to the "standing" of a party is primarily a challenge to the limited jurisdiction of federal courts "to decide the merits of the dispute or of particular issues."[89]   Generally, parties have "standing" to obtain adjudication of their disputes in federal court only if those parties allege and then establish an "injury in fact,"[90] which is not "abstract," "conjectural," or "hypothetical," but

---

[88]   *Starr*, 592 F.3d at 321 (parallel citations omitted).

[89]   *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

[90]   *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473 (1982).

rather "distinct and palpable." [91] Although standing "subsumes a blend of constitutional requirements and prudential considerations,"[92] the latter are not considered if Congress creates statutory standing that is intended to extend to the full limits of Article III.[93]

In the case of the antitrust laws, the Supreme Court has interpreted the Clayton Act to limit statutory standing to certain parties.[94] Private plaintiffs seeking to enforce Sections 1 and 2 of the Sherman Act must satisfy the standing requirements of Section 4 of the Clayton Act which include (1) the presence of an "antitrust injury" suffered by (2) a plaintiff who is a "proper party" to bring suit against the defendant.[95]

In order to state a claim for "antitrust injury," a plaintiff must sue for injury that "is of the type the antitrust laws were intended to prevent and that flows

---

[91]     *Allen v. Wright*, 468 U.S. 737, 751-52 (1984).

[92]     *Valley Forge*, 454 U.S. at 471.

[93]     *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 103 n.9 (1979).

[94]     *See Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534-46 & 535 n.31 (1983) (identifying judge made rules limiting persons entitled to sue under Section 4 of the Clayton Act). *See also Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263 n.14 (1972).

[95]     *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110-11 (1986); *Associated Gen. Contractors*, 459 U.S. at 540-45.

from that which makes defendant's acts unlawful."[96] An "injury, although causally

related to an antitrust violation, nevertheless will not qualify as 'antitrust injury'

unless it is attributable to an anti-competitive aspect of the practice under scrutiny.

. . ."[97] The antitrust injury requirement "ensures that the harm claimed by the

plaintiff corresponds to the rationale for finding a violation of the antitrust laws in

the first place, and it prevents losses that stem from competition from supporting

suits by private plaintiffs for either damages or equitable relief."[98] In sum, a

plaintiff can recover on an antitrust claim only for a loss which "stems from a

competition-reducing aspect or effect of the defendant's behavior."[99]

When analyzing whether a plaintiff is a "proper party" to bring an

antitrust action, a court must balance several factors, none of which is singly

dispositive.[100] Factors to consider in determining whether a plaintiff is a "proper

party" to bring suit include: (1) the causal connection between the alleged antitrust

violation and the harm to the plaintiff; (2) the existence of an improper motive; (3)

---

[96]     *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

[97]     *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (citing *Cargill,* 479 U.S. at 109-10).

[98]     *Id.* at 342.

[99]     *Id.* at 344.

[100]    *See Peck v. General Motors Corp.*, 894 F.2d 844, 846 (6th Cir. 1990).

26

whether the injury was of a type that Congress sought to redress with the antitrust

laws; (4) the directness of the connection between the injury and alleged restraint

in the relevant market; (5) the speculative nature of the damages; and (6) the risk of

duplicative recoveries or complex apportionment of damages.[101]

## IV.   DISCUSSION

### A.   Plaintiff Lacks Standing to Bring Suit Against Defendants

Defendants argue that Simon lacks antitrust standing to bring suit

against them because he is an indirect purchaser, having purchased electricity from

Con Ed rather than directly from KeySpan.  The so-called "direct purchaser rule"

states that, in general, only a direct purchaser can bring an antitrust action against a

seller for a wrongful overcharge.[102]  The origin of this rule can be traced back to

1968, when the Supreme Court decided *Hanover Shoe, Inc. v. United Shoe*

---

[101]   *See Balaklaw v. Lovell*, 14 F.3d 793, 798 (2d Cir. 1994). *See also id.* at 797 n.9 ("[C]ourts must [first] determine whether the plaintiff suffered an antitrust injury. . . . If the answer to that question is yes, they must then determine whether any of the other factors [of the antitrust standing inquiry], largely relating to the directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws.").

[102]   *Seed Temple v. Circuit City Stores*, Nos. 06 CV 5303, 06 CV 5304, 2007 WL 2790154, at *4 (E.D.N.Y. Sept. 25, 2007) ("The dealer who purchases illegally tied goods or services suffers a direct antitrust injury, but the consumer who transacts with that dealer does not, because the consumer's damages flow from the dealer's pass-on of an overcharge.").

*Machinery Corp* ("*Hanover Shoe*")[103]  Since then, the rule was further established

in *Illinois Brick Company v. Illinois* ("*Illinois Brick*")[104] and elaborated upon in

*Kansas v. Utilicorp United, Inc.* ("*Kansas*").[105]

       In *Hanover Shoe*, the defendant, United Shoe Machinery Corporation

("United") raised the defense that the plaintiff, Hanover Shoe, Inc. ("Hanover"),

had passed on the overcharge to its customers and, therefore, had suffered no

legally cognizable injury.

> United claims, however, that Hanover suffered no legally
> cognizable injury, contending that the illegal overcharge
> during the damage period was reflected in the price charged
> for shoes sold by Hanover to its customers and that
> Hanover, if it had bought machines at lower prices, would
> have charged less and made no more profit than it made by

---

[103]   392 U.S. 481 (1968).

[104]   431 U.S. 720 (1977).  In establishing the direct purchaser rule, the Supreme Court analytically distinguished "antitrust injury" from the question of standing, basing its holding on the former.  *See id.* at 728 n.7 ("[W]e do not address the standing issue except to note . . . that the question of which persons have been injured by an illegal overcharge for purposes of § 4 [of the Clayton Act] is analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue for damages under § 4.").  It makes little difference whether the question is framed in terms of antitrust injury or proper plaintiff, as these are the components of "antitrust standing."  *See Paycom Billing Servs. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 285 (2d Cir. 2006) (referring to the absence of antitrust injury as a lack of "antitrust standing").

[105]   497 U.S. 199 (1990).

leasing.[106]

\* \* \*

> United [sought] to limit the general principle that the victim of an overcharge is damaged within the meaning of § 4 to the extent of the overcharge. The rule, United argue[d], should be subject to the defense that economic circumstances were such that the overcharged buyer could only charge his customers a higher price because the price to him was higher.[107]

The Supreme Court rejected this proposed defense, stating that "Hanover proved injury and the amount of its damages for the purposes of its treble-damage suit when it proved that United had overcharged it during the damage period and showed the amount of the overcharge; United was not entitled to assert a passing-on defense."[108] Thus, in *Hanover Shoe*, the Supreme Court ruled that, in general, a pass-on theory may not be used defensively *against* a direct purchaser plaintiff who, in this case, would be Con Ed.

In *Illinois Brick*, the Court was confronted with the issue of whether a pass-on theory could be used offensively by an indirect purchaser plaintiff against

---

[106]   392 U.S. at 487-88.

[107]   *Id.* at 491-92.

[108]   *Id.* at 494. The Court indicated that an exception to the direct purchaser rule may be warranted where an overcharged buyer has a pre-existing cost-plus contract with its customers but it has never explicitly ruled on this issue. *See Temple*, 2007 WL 2790154, at \*3 n.6.

an alleged antitrust violator.[109]   The Court declined to construe section 4 of the

Clayton Act "to permit offensive use of a pass-on theory against an alleged violator

that could not use the same theory as a defense in an action by direct

purchasers."[110]   The Court held that indirect purchasers may not sue for antitrust

damages.[111]   In dismissing the antitrust claims of the indirect purchasers, the Court

stated:

> Permitting the use of pass-on theories under § 4 essentially
> would transform treble-damages actions into massive
> efforts to apportion the recovery among all potential
> plaintiffs that could have absorbed part of the overcharge
> from   direct   purchasers   to   middlemen   to   ultimate
> consumers.   However appealing this attempt to allocate the
> overcharge might seem in theory, it would add whole new
> dimensions of complexity to treble-damages suits and
> seriously undermine their effectiveness.[112]

As in *Hanover Shoe*, the Court intimated that an exception to the

direct purchaser rule may be warranted in the limited circumstance where there is a

pre-existing cost-plus contract.[113]   The Court reasoned that in a cost-plus contract

situation, "the purchaser is insulated from any decrease in its sales as a result of

---

[109]   *See Illinois Brick*, 431 U.S. at 726.

[110]   *Id.* at 735.

[111]   *See id.* at 736.

[112]   *Id.* at 737.

[113]   *Id.* at 736.

30

attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of the price."[114]

The Supreme Court was again confronted with the offensive use of a pass-on theory in *Kansas*, where it was forced to decide "who may sue under § 4 when, in violation of the antitrust laws, suppliers overcharge a public utility for natural gas and the utility passes on the overcharge to its customers."[115]  The Court declined to overrule *Hanover Shoe* or create exceptions for any particular industry.

> Like the State of Illinois in *Illinois Brick*, the consumers in this case have the status of indirect purchasers.  In the distribution chain, they are not the immediate buyers from the alleged antitrust violators.  They bought their gas from the utilities, not from the suppliers said to have conspired to fix the price of gas.  Unless we create an exception to the direct purchaser rule established in *Hanover Shoe* and *Illinois Brick*, any antitrust claim against the defendants is not for them, but for the utilities to assert.[116]

The Court stood by its interpretation of section 4 of the Clayton Act, stating that it would be "an unwarranted and counterproductive exercise to litigate a series of exceptions" even though the "economic assumptions underlying the

---

[114]     *Id.*

[115]     497 U.S. at 203.

[116]     *Id.* at 207.

31

*Illinois Brick* rule might be disproved in a specific case."[117]  The Court further held

that "[t]he suggestion in *Hanover Shoe* and *Illinois Brick* that a departure from the

direct purchaser rule may be necessary when an indirect purchaser buys under a

pre-existing cost-plus contract does not justify an exception in this case."[118]  In

declining to create such an exception, the Court stated:

> The utility customers made no commitment to purchase any
> particular quantity of gas, and the utility itself had no
> guarantee of any particular profit. Even though the
> respondent raised its prices to cover its costs, we cannot
> ascertain its precise injury because, as noted above, we do
> not know what might have happened in the absence of an
> overcharge. In addition, even if the utility customers had a
> highly inelastic demand for natural gas, the need to inquire
> into the precise operation of market forces would negate the
> simplicity and certainty that could justify a cost-plus
> contract exception.[119]

Here, plaintiff seeks to take advantage of the cost-plus contract

exception referred to in *Hanover Shoe*, *Illinois Brick*, and *Kansas*.[120]  The

---

[117]    *Id.* at 217.

[118]    *Id.* at 218 ("Even if we were to create an exception for situations that
merely resemble those governed by such a contract, we would not apply the
exception here.").

[119]    *Id.* (citation omitted).

[120]    *See* Plaintiff's Memorandum of Law in Opposition to Defendants'
Joint Motion to Dismiss the Complaint at 22-23 ("Here, Plaintiff is not seeking a
general exception or a *per se* rule, but rather a finding that an established exception
applies to the particular facts of this case."). *See also id.* at 23 ("Here, Plaintiff

32

fundamental problem with plaintiff's argument is that its premise is false.  Despite Simon's allegation to the contrary,[121] he did not purchase electricity from Con Ed under an existing cost-plus contract.[122]   The monthly amounts of electricity purchased by Simon were not fixed in advance.  Rather, like all other Con Ed consumers, Simon was billed each month for the specific amount of electricity he consumed, measured in kilowatt hours.[123]  Consumers of retail electricity such as Simon have the option of reducing the amount of electricity they consume in response to increases in price.  The rationale behind the cost-plus contract exception does not apply where consumers, like Simon, can reduce their consumption of electricity and thereby affect the amount of overcharge they

plead a pre-existing cost-plus contract between Con Ed and its customers requiring an automatic pass-through of 100% of the overcharge resulting from KeySpan's manipulation of the auction, regardless of other factors.").

[121]    *See* Complaint ¶ 7 ("The quantity of installed capacity for which Plaintiff was required to pay Con Ed was contractually fixed prior to the time the price for such capacity was known and charged to Plaintiff.").

[122]    A court need not accept a factual allegation as true when its falsity is obvious and apparent in light of facts of which a court can take judicial notice.  *See Iqbal*, 129 S. Ct. at 1949 (stating that a pleading that offers "'labels and conclusions'" or "'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice) (quoting *Twombly*, 127 S. Ct. at 1955).

[123]    A typical Con Ed bill states: "We measure your electricity by how many kilowatt hours (kWh) you use.  One kWh will light a 100 watt bulb for 10 hours."  For purposes of this motion, I take judicial notice of my most recent Con Ed bill.

33

absorb.  Accordingly, Simon cannot use the cost-plus contract exception to avoid application of the direct purchaser rule.

Furthermore, the proposition that Con Ed is able to pass through one hundred percent of any overcharge to its consumers in the form of retail price increases is suspect given the differing nature of the two markets.  Con Ed purchased installed capacity from KeySpan while Simon purchased retail electricity from Con Ed.  Plaintiff has failed to allege how the demand for retail electricity by individual consumers translates into the demand for installed capacity by direct purchasers like Con Ed.  Given that the markets for installed capacity and retail electricity are inherently dissimilar, the proposition that Con Ed could pass through one hundred percent of its supply cost increases to Simon and other consumers without *any* decrease or fluctuation in the level of retail sales is suspect.

In sum, Simon tries to circumvent the direct purchaser rule on two grounds: (1) that Simon purchased retail electricity from Con Ed under a pre-existing cost-plus contract even though he never committed to buying pre-determined, fixed quantities of electricity regardless of cost; and (2) that Con Ed was capable of a complete and provable pass-on of one hundred percent of its increased supply costs resulting from the allegedly illegal overcharge.  However, because Simon did not purchase electricity under a fixed quantity, cost-plus

34

contract with Con Ed, he does not fall within any cost-plus contract exception to

the direct purchaser rule. Accordingly, Simon's federal antitrust and monopoly

claims[124] are hereby dismissed because he has not suffered a legally cognizable

antitrust injury and, therefore, lacks antitrust standing.[125]

## B.   The Filed Rate Doctrine

Even if plaintiff did have antitrust standing, his claims would

nonetheless be dismissed on an alternative ground, namely, the filed rate doctrine.

Plaintiff's claims impermissibly seek to challenge as unreasonable the filed rates

KeySpan offered in the wholesale auctions. Plaintiff's causes of action are all

premised on the assertion that plaintiff was injured in the retail electricity market

because KeySpan offered to sell its capacity in the installed capacity auctions at

"supracompetitive" prices.[126]   Because this alleged "supracompetitive" price is the

filed rate that FERC authorized KeySpan to offer in the installed capacity market,

any claim asserting that some other rate would have been charged is barred as a

---

[124]   Counts I through VI are dismissed on this ground.

[125]   Given the inapplicability of a cost-plus contract exception, the concerns over Con Ed's ability to pass through costs is essentially *dicta*.

[126]   *See, e.g.*, Complaint ¶¶ 67, 70, 73, 77, 82, 85, 91.

35

matter of law under the filed rate doctrine.[127]

Because the rate challenged by plaintiff as "supracompetitive" was a FERC filed rate, the adjudication of plaintiff's claims would require this Court to determine "a hypothetical rate different from that actually set by FERC."[128] Such a hypothetical construct is prohibited by the filed rate doctrine, which bars both federal and state claims where the challenged rates were either fixed or accepted by FERC.[129]

> Under the filed rate doctrine, the terms of the filed tariff are considered to be "the law" and to therefore conclusively and exclusively enumerate the rights and liabilities of the contracting parties. As a result, the filed rate doctrine bars all claims – state and federal – that attempt to challenge [the terms of a tariff] that a federal agency has reviewed and filed.[130]

---

[127] *Wegoland Ltd. v. NYNEX Corp.*, 27 F.3d 17, 21 (2d Cir. 1994) (stating that "any 'filed rate' - that is, one approved by the governing regulatory agency - is per se reasonable and unassailable in judicial proceedings brought by ratepayers").

[128] *Transmission Agency of N. Cal. v. Sierra Pac. Power Co.*, 295 F.3d 918, 929-30 (9th Cir. 2002).

[129] *See Montana-Dakota Utils. Co. v. Northwest Pub. Serv. Co.*, 341 U.S. 246, 251 (1951); *Wegoland*, 27 F.3d at 18 ("The filed rate doctrine bars suits against regulated utilities grounded on the allegation that the rates charged by the utility are unreasonable.").

[130] *California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 853 (9th Cir. 2004) (quotation marks and citations omitted, brackets in original)).

Furthermore, "the underlying conduct [of the defendant] does not control whether the filed rate doctrine applies. Rather, the focus for determining whether the filed rate doctrine applies is the impact the court's decision will have on agency procedures and rate determinations."[131] Thus, "[a]pplication of the filed rate doctrine in any particular case is not determined by the culpability of the defendant's conduct or the possibility of inequitable results."[132] Accordingly, when FERC has approved a rate pursuant to its applicable tariffs, courts must "give effect to Congress' desire to give FERC plenary authority over interstate wholesale rates."[133]

---

[131]    *H.J. Inc. v. Northwest Bell Tel. Co.*, 954 F.2d 485, 489 (8th Cir. 1992).

[132]    *Marcus v. AT&T Co.*, 138 F.3d 46, 58 (2d Cir. 1998). *Accord Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 417 (1986) (filed rate doctrine bars antitrust damages action even if defendants colluded to set an artificially high filed rate); *Sun City Taxpayers' Ass'n v. Citizens Utils. Co.*, 45 F.3d 58, 62 (2d Cir. 1995) (holding that the filed rate doctrine bars consumer claims despite carrier's fraud during ratemaking process).

[133]    *Nantahala Power & Light Co.*, 476 U.S. at 966 ("FERC clearly has exclusive jurisdiction over the rates to be charged . . . [to] wholesale customers."). *Accord Fax Telecomms. v. AT&T*, 138 F.3d 479, 488 (2d Cir. 1998) (the filed rate doctrine bars any claim challenging the terms and conditions of the filed rate because "'[u]nless and until suspended or set aside, this rate is made, for all purposes, the legal rate [and the] . . . rights as defined by the tariff cannot be varied or enlarged by either contract or tort'") (quoting *Keogh v. Chicago & Northwest Ry. Co.*, 260 U.S. 156, 163 (1922)).

Plaintiff's unfounded allegation that the price Con Ed paid for capacity during the relevant period was not a rate set by tariff is incorrect for two reasons. *First*, the prices offered by KeySpan in the capacity auctions were authorized under the NYISO Tariff that FERC approved and issued pursuant to its authority under the Federal Power Act.[134]   The NYISO Tariff set the rates that KeySpan could offer in the capacity auctions. *Second*, any rates charged by KeySpan pursuant to its FERC-approved authority under its separate MBR Tariff, either in the wholesale auctions for capacity or in contracts for wholesale electricity, were also unassailable as a "filed rate" protected by the filed rate doctrine.[135]

In sum, the FERC-authorized rates that KeySpan offered in the capacity auctions have the force of federal law and can only be altered or refunded through adjudicatory proceedings that must be commenced before FERC pursuant to rules established under the Federal Power Act.[136]  Plaintiff's claims

---

[134]     *See* FERC Order at ¶ 145.

[135]     *See Public Utility Dist. No. 1 of Grays Harbor County Wash. v. IDACORP Inc.*, 379 F.3d 64, 651 (9th Cir. 2004) (holding that rates charged pursuant to FERC's market-based rate regime "satisfy the filed rate doctrine for market-based rates").

[136]     *See* 16 U.S.C. § 824e(b) (setting forth conditions for refunds of filed rates).

impermissibly seek to challenge those rates and must, therefore, be dismissed under the filed rate doctrine. Accordingly, the filed rate doctrine serves as an alternative ground in which to dismiss all of plaintiff's claims, based on both federal and state law.[137]

## C.   Preemption

The doctrine of federal preemption provides an independent basis for dismissing all of plaintiff's state law claims. "Federal preemption of state law is rooted in the Supremacy Clause, Article VI, clause 2, or the United States Constitution."[138]   Preemption may be express or implied.

> Federal preemption of state law can occur in several different ways: first, Congress may explicitly provide for preemption; second, Congress' intent to preempt state law may be inferred where the federal regulation in a particular area 'left no room for supplementary state regulation;' third, state law is nullified to the extent that it actually conflicts with federal law.[139]

Here, plaintiff's state law claims are preempted under both "field preemption" and "conflict preemption."

---

[137]     *See AT& T Co. v. Central Office Tel., Inc.*, 524 U.S. 214, 227-28 (1998) (filed rate doctrine barred state law claims for breach of contract and tortious interference with contractual relations).

[138]     *Transmission Agency of Ca.,* 295 F.3d at 928.

[139]     *New York v. FCC*, 267 F.3d 91, 101 (2d Cir. 2001).

"In the absence of express preemption, federal law may pre-empt state claims in two ways. . . . Under field preemption, "[i]f Congress evidences an intent to occupy a given field, any state law falling within that field is preempted." *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984). Alternatively, there is conflict preemption: "[i]f Congress has not entirely displaced state regulation over the matter in question, state law is still pre-empted to the extent it actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Id.*"[140]

In sum, "[a]s a result of FERC' s exclusive authority in the area, any cause of action or claim that requires a forum other than FERC to compute the reasonable price for wholesale electricity or damages based upon the payment of a price in excess of the reasonable price is barred by the three related doctrines of field preemption, conflict preemption and the filed rate doctrine."[141] FERC created and oversees every aspect of the Capacity Market at issue, including how prices are determined and how suppliers like KeySpan can exercise any market power they may have to influence clearing prices at auction. Plaintiff's state law claims based

---

[140] *In re NRG Energy, Inc.*, No. 03-13024, 2006 WL 2385217, at *3 (Bkrtcy. S.D.N.Y. May 17, 2006) (quoting *California v. Dynergy, Inc.*, 375 F.3d at 849).

[141] *Id.* at *4.

40

on New York's General Business Law[142] plainly intrude on FERC's comprehensive regulation of this wholesale market.[143]  Such claims are both field and conflict preempted as a matter of law and are therefore dismissed.[144]

### D.    Leave to Amend the Complaint

Under Federal Rules of Civil Procedure 15(a), leave to amend a complaint should be "freely given when justice so requires."[145]  In general, a plaintiff should be permitted to amend his complaint prior to its dismissal for failure to state a claim "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim."[146]  Thus "it is well established that leave to amend a complaint need not be

---

[142]    Counts VII through X.

[143]    Plaintiff's unjust enrichment claim, Count XI, must be dismissed on the ground that plaintiff has failed to allege that defendants received a "specific and direct benefit" from plaintiff.  *See Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) ("To prevail on a claim for unjust enrichment in New York, a plaintiff must establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that "equity and good conscience" require restitution.").

[144]    In any event, having dismissed all of plaintiff's federal claims, this Court would decline to exercise supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c)(3), which provides that a district court "may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction."  The fact that plaintiff's state law claims are preempted serves to bolster their dismissal.

[145]    Fed. R. Civ. P. 15(a).

[146]    *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999).

granted when amendment would be futile."[147]

Here, plaintiff's claims have been dismissed, as a matter of law, on the following grounds: lack of antitrust injury/antitrust standing; the filed rate doctrine; and the federal preemption doctrine.  There are no allegations that plaintiff could add that could possibly rescue his claims.  Thus, amendment of the instant Complaint would be futile and, for that reason, is denied.

## V.   CONCLUSION

Plaintiff's Complaint is dismissed in its entirety, with prejudice and without leave to amend.  The Clerk of the Court is directed to close defendant's joint motion to dismiss (Document # 13) and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:  New York, New York
        March 22, 2011

---

[147]   *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003).

## - Appearances -

**For Plaintiff:**

Judith L. Spanier, Esq.
Abbey Spanier Rodd & Abrams, LLP
212 East 39th Street
New York, NY 10016
(212) 889-3700

Daniel J. Sponseller, Esq.
409 Broad Street, Suite 200
Sewickley, PA 15143
(412) 741-4422

**For Defendants:**

John H. Lyons, Esq.
Tara S. Emory, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP (DC)
1440 New York Avenue N.W.
Washington, D.C. 20005
(202)-371-7000

Jon R. Roellke, Esq.
Anthony R. Van Vuren, Esq.
Bingham McCutchen, LLP
2020 K Street, NW
Washington, D.C. 20006
(202) 373-6000